**2026 UT App 108**

# THE UTAH COURT OF APPEALS

TRISHNA PAULSON,
Appellee,
*v.*
CHRISTOPHER PAULSON,
Appellant.

Opinion
No. 20220914-CA
Filed July 16, 2026

Fourth District Court, Provo Department
The Honorable Christine S. Johnson
The Honorable Jennifer A. Mabey
No. 184400701

Rodney R. Parker, Attorney for Appellant

Julie J. Nelson and Aaron Harris,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion, in which JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Christopher Paulson challenges several of the orders the trial court issued in the divorce proceedings between him and his former spouse, Trishna Paulson.[1] Specifically, he contests (1) the exclusion of an expert witness, (2) a number of partial summary judgment decisions establishing that various properties are Trishna's separate property, (3) the denial of his request for attorney fees, and (4) the denial of his motion to disqualify the

---

1. Because the parties share a last name, we refer to them by their given names, with no disrespect intended by the apparent informality.

trial judge based on an appearance of bias. While we see no error in the determinations regarding Trishna's separate property or the alleged bias of the trial judge, we do find merit in Christopher's arguments regarding the excluded expert and the attorney fees request. We therefore affirm in part and reverse in part, and we remand this case for such further proceedings as are now appropriate.

## BACKGROUND

### *The Premarital Agreement*

¶2      Christopher and Trishna were married on August 21, 1992. Prior to their marriage, they signed a premarital agreement (the Agreement), which was "to be construed and enforced under the laws of the State of California."[2] The Agreement was entered based on both the parties' "desire to define the respective rights of each in and to the property of the other from and after the solemnization of the marriage" and the parties' intention "to limit the application of the community property laws of the State of California or of any other community property State or country in which the parties, from time to time, may reside or be domiciled." And one of the initial recitals of the Agreement declared, "It is mutually desired by the parties hereto that any property acquired by either of the parties hereto after the solemnization of the marriage shall be the separate property of the party so acquiring the same . . . ."

¶3      Section 3 of the Agreement, entitled "Future Ownership of Property," further addressed property that the parties already

---

2. Although the dates on which the parties' signatures were notarized were after the parties' marriage, the trial court found that the Agreement was signed before the marriage. And while Christopher categorizes this as a disputed fact, he concedes for purposes of this appeal that the Agreement is valid.

possessed or might acquire after their marriage. One provision in this section addressed Trishna's separate property as follows:

> The property possessed by Trishna at the time of the Marriage between her and Christopher is and shall remain her sole and separate property and shall be subject entirely to her individual control and management, both before and after the Marriage, in the same manner as if she were unmarried. Christopher agrees that he does not [have] and will not, by reason of the Marriage, acquire any interest in the property, either for himself, his heirs, assigns, successors in interest, or creditors, nor does he [have] nor will he acquire any right in or to the income, rents, profits, accretions or use of such property, or any part or portion thereof, arising for any reason whatsoever . . . .

A separate provision with largely identical language addressed Christopher's separate property and Trishna's lack of interest in it.

¶4     Section 3 also addressed future property the parties may acquire as follows:

> All of the property which either of the parties may hereafter acquire, or to which he or she shall be or become entitled, either before or after the Marriage, and the income, rents and profits of and accretions to all such property, shall be the separate property of the party so acquiring the same and shall be subject entirely to the individual control and management of such party in the same manner as if he or she were unmarried, and the other party shall have no right to or interest in said property whatsoever. In addition, it is expressly agreed that all other property acquired by either of the parties

which would, except for this . . . Agreement, be the community property of said parties by reason of the laws of the State of California or any other State or country in which the parties, from time to time, may reside, and the income, rents and profits of and accretions to all such property, shall be the separate property of the party so acquiring the same, regardless of how said property may be acquired, except as hereinafter provided.

¶5 Section 3 further provided that the "sole exception" to the separate property categorization was "that the cash 'salary' each of them receives shall be considered the community property of the parties." The language went on to clarify that "'bonuses' received by either party or non-cash compensation of any sort" would be separate property.

¶6 Additionally, Section 3 also specified, "The separate property of each of the parties hereto shall not be liable for debts or obligations incurred by the other party, whether arising before or after the Marriage and whether now known or unknown." Section 3 instructed that "separate bank accounts shall be maintained by each of the parties . . . with respect to the separate property cash of each," but the Agreement did contemplate a joint bank account wherein the parties would deposit their community income and from which they would pay all their living expenses.

¶7 Section 6 of the Agreement was entitled "Transmutation" and contained the following provision specifically setting forth the circumstances whereby a party's separate property could become community property:

Except as otherwise provided herein, property or interests now owned or hereafter acquired by the parties, which by the terms of this Agreement is classified as the separate property of one of them, can only become the separate property

of the other or the parties' community property by a written instrument executed by the party whose separate property is thereby reclassified.

¶8    A financial statement attached to the Agreement listed Trishna's net worth at the time of the marriage as $1,803,148, the bulk of which was attributable to the value of stock she had received from her employer, the Koosharem Corporation. Christopher, on the other hand, brought no significant assets into the marriage.

*The Marriage*

¶9    During the marriage, neither party earned a significant cash salary. However, at various points in the marriage, Trishna sold portions of her Koosharem Corporation stock "for a total value of $21,827,123." Trishna "also generated other funds through real estate investments that she owned."

¶10    As anticipated by the Agreement, the parties maintained a joint account into which their cash salaries were deposited and from which household expenses were paid. Although Trishna maintained other bank accounts to facilitate her investment activities, she also "intermittently deposited" funds from her separate accounts and funds from her real estate investments into the joint account.

¶11    Regarding expenses paid from the joint account, the trial court later found that "the parties spent $412,380 per year in household expenses," which was "approximately $330,000 more than the highest amount of gross cash salary that the parties earned in any year between 2005 and 2017." As a result, the payment of the household expenses was necessarily "supplemented by other funds." The additional funds that Trishna deposited in the joint account "allowed it to be used for many purchases, including family expenses that were beyond the parties' joint salaries, as well as purchases of personal property

and real estate." And when executing some number of these purchases, the properties thereby acquired were titled in both parties' names. And on some occasions, Trishna put funds into a trade account with Christopher's name on it.

¶12 After twenty-six years of marriage, Trishna petitioned for divorce in March 2018. Christopher responded, asserting, among other things, a claim for alimony. Several years of litigation have followed.

*Partial Summary Judgments Regarding Property*

¶13 A significant part of the subsequent litigation addressed the various assets acquired during the marriage. Trishna filed sixteen separate motions for partial summary judgment, which sought rulings that various assets were obtained with Trishna's separate property and were therefore not marital property subject to division upon divorce. Christopher opposed all but two of the partial summary judgment motions.

¶14 The trial court granted partial summary judgment in favor of Trishna as to each property. The court determined that there was no material dispute of fact that each piece of property was, indeed, Trishna's separate property. The court did, however, address several legal arguments in its decisions.

¶15 The underlying feature creating complexity in the partial summary judgment determinations was the fact that Trishna had regularly deposited her personal funds into the parties' joint bank account and then, at some point, used amounts from that account to fund other investments. Based on Trishna's placement of her separate funds into the parties' joint account, Christopher argued that, pursuant to the Agreement, Trishna was prevented from claiming that the funds retained their separate property status. But the trial court rejected this argument as follows:

Because [Trishna] failed to keep her separate funds separate, [Christopher] argues that she breached the Agreement and is estopped from claiming that any funds in the joint accounts were her separate funds. This argument is summarily rejected. While the Agreement does direct the parties to maintain separate funds in separate accounts, that clause does not include any penalty or waiver provision which would direct the result [Christopher] seeks. [Trishna's] failure to keep her separate funds in a separate account necessitates the tracing of her funds, and it certainly has complicated these proceedings. But it does not support any waiver or estoppel argument.

¶16    In at least some of his objections, Christopher suggested that the transmutation provision of the Agreement was satisfied in instances where the acquired property was jointly titled in both parties' names or where Trishna's separate funds were put in an account with only Christopher's name. But the court determined that more was required under the Agreement to change the nature of Trishna's separate property and that without a specific writing acknowledging the reclassification, the ownership of the property would be unaffected.

¶17    To address the issue of Trishna's separate funds being deposited into the joint account, the trial court, where possible, directly traced the funds for the purchase of assets back to specific separate funds that Trishna deposited in the account. And when such direct tracing was not possible, the court employed an "exhaustion tracing" methodology, wherein it reasoned that because the parties' cash salaries did not cover their household expenses—a point which Christopher apparently conceded—the monies with which the properties were purchased must have necessarily come from additional amounts deposited by Trishna into the joint account.

*The Alimony Determination*

¶18 On August 3, 2020—seven days after the close of fact discovery—Christopher filed an expert disclosure revealing his intent to call a certain financial expert (Expert). The disclosure specified the following:

> [Expert] will provide expert opinion testimony . . . . [Expert] is expected to testify regarding: the parties' marital lifestyle, the parties' financial circumstances at the time of the divorce; equal division of marital assets and liabilities; the parties' current financial circumstances; the parties' gross and net incomes; the *Jones* Utah alimony factors; [and Christopher's] request for alimony.

After stating that Expert's qualifications and fee schedule were provided as attachments, the disclosure set forth the following additional information regarding Expert's testimony:

> In performing his analysis, [Expert] may rely on the following documents and/or information:
>
> > i. Testimony and/or interviews (to be arranged via counsel) of the parties;
> >
> > ii. The facts as they apply to the factors set forth in Utah Code [section 81-6-203(6)(b)];
> >
> > iii. The parties' financial declaration(s) and/or employment and income information produced in this case;
> >
> > iv. Pleadings filed in this case;
> >
> > v. The parties' tax documents and returns produced in this case;

vi. Analysis and/or expert report of any of other experts; and

vii. Other relevant market, industry and economic data and publications as needed.

¶19 Believing that Christopher's expert disclosure was deficient under rule 26 of the Utah Rules of Civil Procedure, Trishna made no election "to depose [Expert] or request an expert report from him," "judging that doing so would cure the deficiencies in [Christopher's] disclosure." Instead, two days later, on August 5, 2020, she moved for summary judgment on the alimony issue, arguing that Christopher could not "meet the evidentiary threshold required to present evidence" of his needs as the recipient spouse.

¶20 Despite the fact that Trishna had made no election for an expert report under rule 26, Christopher sent her an expert report on August 24, 2020—which was well within the allowed timeframe for supplying the report even had Trishna immediately requested a report in response to the earlier expert disclosure. Nonetheless, on September 18, 2020, Trishna filed a motion for sanctions, requesting the exclusion of Expert. And sometime thereafter, Christopher offered to allow Trishna to depose Expert as well, since the time for her to elect to do so had since passed.

¶21 After oral arguments on both motions, the trial court granted Trishna's motion for sanctions and her motion for partial summary judgment in February 2021. The court agreed that Christopher's expert disclosure had not satisfied the requirements of rule 26, and it also determined that the inadequate disclosure was not harmless, pointing to Trishna's "strategic decision" to neither depose Expert nor request an expert report and the fact that it was then too late to make such an election or to choose to designate a rebuttal expert. And the trial court further agreed that without the testimony of Expert, Christopher had "offered no

evidence regarding his financial need" and was "unable to meet his burden in seeking alimony."

*Christopher's Motion to Disqualify*

¶22 Prompted by several adverse rulings, including the partial summary judgment denying alimony and an unrelated contempt ruling against Christopher, Christopher's attorney "tasked a law clerk . . . to undertake research to determine whether the over[t] hostility that [the trial judge] ha[d] displayed . . . w[as] grounds to seek her recusal." As a result of this inquiry, Christopher's attorney discovered that the trial judge had previously retained an attorney who belonged to the same law firm as Trishna's attorney.[3] This previous representation concerned a critical opinion column published in a local newspaper in October 2018 that urged readers to vote "no" in the judge's upcoming retention election.

¶23 As a result of these discoveries, Christopher filed a motion to disqualify the trial judge in July 2021, pointing specifically to a demand letter threatening litigation that was sent to the newspaper by the judge's attorney in October 2018. Christopher asserted that because the judge's attorney and the attorney that began representing Trishna in May 2019 were members of the same law firm, this created an appearance of bias.

¶24 Christopher's motion was certified to the presiding judge for determination, pursuant to rule 63 of the Utah Rules of Civil Procedure. The presiding judge denied the motion, determining both that the motion was untimely and that "a review of the motion on its merits also fail[ed] to demonstrate a basis for disqualification." Concerning the merits, the presiding judge

---

3. Although Trishna's attorney had left this law firm by the time the disqualification issue arose in July 2021, he had been representing Trishna while employed by this law firm from May 2019 through December 2020.

reasoned, "Given that the election resulted in [the trial judge] being retained, it would appear that her representation ended relatively shortly thereafter, and there is no information before the [c]ourt to indicate that the representation is ongoing." And the presiding judge agreed with an informal advisory opinion by the Utah Judicial Ethics Advisory Committee that there would be no reasonable appearance of bias in such a situation—once the attorney-client relationship had ceased.

*The Attorney Fees Determination*

¶25 A trial was held in June 2022 to dispose of the remaining issues that had not been resolved by way of partial summary judgment. Relevant to this appeal are the court's determinations as to Christopher's request for an award of attorney fees under Utah Code section 81-1-203(1). *See* Utah Code § 81-1-203(1) (allowing for an award of attorney fees against one party in certain domestic cases in order "to enable the other party to prosecute or defend the action").[4]

¶26 In assessing Christopher's financial need for attorney fees, the trial court considered several obligations Trishna had paid on behalf of Christopher over the previous few years while the case was pending, including insurance premiums, health-care related expenses, utilities, home maintenance expenses, tax preparation expenses, credit card payments, and expenses related to the parties' minor child. These amounts over that period totaled $191,165. The court also highlighted that Christopher had been allowed to live rent-free in the family home for several months

---

4. At the time that the trial court ruled on Christopher's request for attorney fees, this provision was codified as Utah Code section 30-3-3(1). *See* Utah Code § 30-3-3(1) (2021). But because the amendments attendant to the subsequent recodification of the section in no way affect the issues raised on appeal, we reference and cite the current version of the code for convenience.

after Trishna filed for divorce, and the court valued that benefit at $90,000.

¶27 Next, the trial court considered funds accessible to Christopher while the divorce was pending. These included $80,000 he spent from one of the bank accounts and $247,000 he received from the resale of sporting events tickets. The court also stated that Christopher had received "$337,998 from the sale of [a piece of real property]." In addition, the court pointed to a classic car worth over $80,000 that was Christopher's separate property. And finally, the court imputed annual income of $54,000 to Christopher, reasoning that "if he had sought employment," he "could have earned an additional $162,000" during the pendency of the case.

¶28 Totaling up these amounts, the trial court concluded that Christopher "had access to, or the opportunity to earn, $1,214,413 in income, available cash, and cash equivalent value during the same time that he claims he was unable to pay his attorneys."[5] The court determined that these funds were largely available to pay his attorneys because Christopher "had no living expenses to speak of, other than to pay for his own food, his own fuel, his own cellular phone, and his own travel." Based on this analysis, the court determined that Christopher "did have financial resources

---

5. We recognize that the various amounts enumerated by the trial court (which are all set forth here, *see supra* ¶¶ 26–27) are $26,250 short of totaling the $1,214,413 sum reached by the court. This is likely because the court also considered as funds available to Christopher the $26,250 in interest payments that he had received as part of the sale of another piece of real property.

    We further note that the court had awarded Trishna this $26,250 in interest payments, as well as the $337,998 in real estate sale proceeds listed above, and Christopher had been ordered to pay Trishna those amounts with interest.

at his disposal to pay [his] attorney fees" and that he was "not entitled to seek an attorney fee award."

¶29    Thereafter, the trial court gave an additional reason for its conclusion that Christopher was "not entitled to seek an attorney fee award." The court reasoned that through the Agreement, "Christopher ha[d] already agreed that Trishna [would] not use her separate property to pay for any of his obligations." Thus, the court concluded, Christopher had "waived any entitlement that he would otherwise have to ask [the court] to order Trishna to use her separate property to pay any obligation that [he] owes to his lawyers."

¶30    Christopher timely appealed.

ISSUES AND STANDARDS OF REVIEW

¶31    First, Christopher contests the trial court's exclusion of Expert based on a failure to comply with the expert disclosure requirements of rule 26 of the Utah Rules of Civil Procedure. "As long as it applies the correct law, a court has discretion in determining whether disclosure is complete, whether later remedy of nondisclosure or incomplete disclosure is harmless, or whether good cause exists for any related failure." *Phillips v. Skabelund*, 2021 UT App 2, ¶ 37, 482 P.3d 237.

¶32    Christopher next challenges multiple legal conclusions underlying the trial court's various partial summary judgment rulings in which the court determined, among other things, that certain properties were Trishna's separate property and not subject to division as part of the marital estate. When we review such orders, "the trial court's resolution of the legal issues is accorded no deference since entitlement to summary judgment is a question of law." *Kouris v. Utah Highway Patrol*, 2003 UT 19, ¶ 5, 70 P.3d 72 (quotation simplified). Accordingly, to the extent these issues are preserved for appeal, "we determine only whether the

trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact." *Id.* (quotation simplified).

¶33    Christopher also appeals the trial court's denial of his request for attorney fees made pursuant to Utah Code section 81-1-203(1). "The decision to award or deny attorney fees in domestic cases is within the trial court's sound discretion, and we will disturb the decision only if the trial court abuses that discretion." *Wollsieffer v. Wollsieffer*, 2019 UT App 99, ¶ 9, 446 P.3d 84 (quotation simplified).

¶34    Finally, Christopher challenges the denial of his motion to disqualify the trial judge. "Whether the district court erred in declining to disqualify the trial judge on the basis of bias is a question of law, which we review for correctness." *State v. Boyer*, 2020 UT App 23, ¶ 19, 460 P.3d 569.

ANALYSIS

I. Expert Exclusion

¶35    Christopher argues that the trial court erred by excluding Expert as a sanction for the failure to comply with the disclosure requirements of rule 26 of the Utah Rules of Civil Procedure. He argues that his disclosure, "although not robust, was adequate under the circumstances" and that, even if not, any failures were harmless. We address each argument in turn.

A.    Compliance with the Requirements of Rule 26

¶36    Rule 26 provides that the disclosure of a retained expert must include the following: "(i) the expert's name and qualifications, including a list of all publications authored within the preceding 10 years, and a list of any other cases in which the expert has testified as an expert at trial or by deposition within the

preceding four years, (ii) a brief summary of the opinions to which the witness is expected to testify, (iii) the facts, data, and other information specific to the case that will be relied upon by the witness in forming those opinions, and (iv) the compensation to be paid for the witness's study and testimony." Utah R. Civ. P. 26(a)(4)(A).[6] Specific to the required disclosure of expert opinions, this court explained in *RJW Media Inc. v. Heath*, 2017 UT App 34, 392 P.3d 956, that adequate disclosure is not accomplished by providing "broad, conclusory statements" or by simply listing "general topics on which the expert might opine." *Id.* ¶¶ 24, 27 (quotation simplified). Instead, "[d]isclosure of specific facts and opinions is required so that parties can make better informed choices about the discovery they want to undertake or, just as important, what discovery they want to forgo." *Id.* ¶ 25.

¶37 Christopher's expert disclosure stated, "[Expert] is expected to testify regarding: the parties' marital lifestyle, the parties' financial circumstances at the time of the divorce; equal division of marital assets and liabilities; the parties' current financial circumstances; the parties' gross and net incomes; the *Jones* Utah alimony factors; [and Christopher's] request for alimony." And as to the information on which Expert's testimony would rely, the disclosure listed (1) "Testimony and/or interviews (to be arranged via counsel) of the parties"; (2) "The facts as they apply to the factors set forth in Utah Code [section 81-6-203(6)(b)]"; (3) "The parties' financial declaration(s) and/or employment and income information produced in this case"; (4) "Pleadings filed in this case"; (5) "The parties' tax documents and returns produced in this case"; (6) "Analysis and/or expert report of any of other experts"; and (7) "Other relevant market, industry and economic data and publications as needed." The trial court, applying *RJW Media*, determined that Christopher's

---

6. Rule 26 has been amended since the time of the expert disclosure here, but because those amendments are not material to our analysis, we cite the current version of the rule.

disclosure was deficient both in its failure to provide a summary of opinions and in its failure to provide the case-specific information underlying those opinions.

¶38 The trial court correctly interpreted rule 26 and did not abuse its discretion by determining that Christopher's expert disclosure did not satisfy the requirements of that rule. The disclosure listed general topics of expected testimony, with no actual identification of what Expert's opinions on those topics were. Indeed, the disclosure consisted of broad statements akin to the those specifically highlighted by our supreme court's Advisory Committee on the Rules of Civil Procedure as being clearly inadequate, such as "The witness will testify on causation." *See* Utah R. Civ. P. 26 advisory committee's note to the 2011 amendment. Likewise, the information sources listed were very general and largely unhelpful in deciphering what opinions Expert would be providing in the case.

¶39 On appeal, in opposing the trial court's decision, Christopher makes no direct argument that his expert disclosure met the specifically listed requirements of rule 26. Instead, he attempts to distinguish *RJW Media* because that case analyzed the disclosure of a *non-retained* expert witness, unlike the retained expert witness in this case. He argues that this distinction is important because the disclosure of a non-retained expert "may be the [opposing] party's only opportunity to obtain the information necessary to permit formulation of a response."

¶40 We do not agree that the guidance of *RJW Media* as to the disclosure of expert opinions is inapplicable to retained experts. First, the language of the rule requiring disclosure of opinions is essentially the same for retained and non-retained experts. *Compare* Utah R. Civ. P. 26(a)(4)(A) (providing that the disclosure of a retained expert must include "a brief summary of the opinions to which the witness is expected to testify"), *with id.* R. 26(a)(4)(E) (providing that the disclosure of a non-retained expert

must include "a written summary of the facts and opinions to which the witness is expected to testify"). Second, *RJW Media*'s analysis heavily relied on the advisory committee's note that addresses the disclosure of expert testimony generally and that applies to disclosure of both retained and non-retained experts. *See* 2017 UT App 34, ¶¶ 22–26. Third, where the *RJW Media* analysis *does* specifically discuss the nature of non-retained experts versus retained experts, it does so to recognize "that non-retained experts may pose challenges for the sponsoring party" and that, in such a case, "rule 26 insulates against the imposition of overly specific disclosure requirements in favor of a more pragmatic, flexible standard." *Id.* ¶ 27. Thus, any difference between the standards for retained and non-retained expert disclosures actually cuts the other way—that is, it is the non-retained expert disclosure that involves a more flexible standard.

¶41 Christopher also argues that his expert disclosure was adequate because it "apprised Trishna of the subject matter of [Expert's] testimony sufficiently to allow Trishna to evaluate the need for rebuttal experts and the need for a report." But that is not the requirement set forth by the rule, which specifically requires a summary of opinions. Christopher's disclosure simply did not meet the requirements of the rule, and any argument he wishes to make about the disclosure being nonetheless adequate would, at most, be addressed by the rule's provision regarding harmlessness.

## B. Harmlessness

¶42 Rule 26 provides that "[i]f a party fails to disclose or to supplement timely a disclosure . . . , that party may not use the undisclosed witness . . . unless the failure is harmless or the party shows good cause for the failure." Utah R. Civ. P. 26(d)(4). "We recognize that assessment of harm in this context is a nuanced matter, and that it is sometimes difficult to tell if a defendant has really been harmed or is just feigning harm for the purposes of

trying to get the plaintiff's damages claims dismissed on non-merits grounds prior to trial." *Butler v. Mediaport Ent. Inc.*, 2022 UT App 37, ¶ 48, 508 P.3d 619. And we accord discretion to the trial court on its harmlessness determination because the trial court "will almost always have a better vantage point than we do to make such a call." *Id.*

¶43 Christopher argued below that the inadequacies of his disclosure were harmless under the circumstances, in large part because he had provided Trishna with a complete expert report three weeks after his expert disclosure and, in addition, was willing to allow Trishna to depose Expert after that. Nonetheless, the trial court determined that Trishna suffered harm from the inadequate disclosure because she "made the strategic decision" to respond only by seeking summary judgment on the issue (not electing either to receive an expert report or to depose Expert, and not designating her own rebuttal expert) and it was now too late to take any of those responsive actions anticipated by rule 26. Notwithstanding the considerable discretion we accord trial courts on this question, we determine that the trial court exceeded that discretion on this point under the specific circumstances of this case.

¶44 Christopher provided an expert report shortly after his deficient disclosure—several weeks before Trishna moved for sanctions under rule 26—and was also willing to allow Trishna to depose Expert, thus providing her both of the options that she would normally have under rule 26. "[A] disclosure violation may cause some harm in the moment, on the day it was made, but if that harm has been completely ameliorated—on its own, or through actions of the parties—in the intervening time between the disclosure and the eventual court hearing on the matter, then no harm exists at the time the court is asked to make its determination as to harmlessness." *Al-Imari v. Utah Dep't of Transp.*, 2026 UT App 15, ¶ 44, 586 P.3d 965, *petition for cert. granted*, June 11, 2026 (No. 20260261). And any timing extensions

that would be necessary to allow Trishna to depose Expert (or to designate a rebuttal expert) appear quite harmless under the circumstances of this case. At this point in the divorce proceedings—August 2020—no trial date had yet been set, and due to the state-wide court restrictions relating to the COVID-19 pandemic, no trial was expected to commence at any point in the near future. Indeed, trial was not ultimately able to be held in this case until June 2022.

¶45 Thus, we determine that the trial court exceeded the sound exercise of its discretion in determining that the deficiencies in Christopher's expert disclosure harmed Trishna.

C. Summary Judgment on Alimony

¶46 Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). The trial court granted summary judgment against Christopher on his alimony claim because he "offered no evidence regarding his financial need." But this conclusion is necessarily impacted by our determination that the court exceeded the sound exercise of its discretion in excluding Expert, who Christopher had retained to testify about alimony. We therefore reverse this partial summary judgment determination and remand the case for further proceedings on the issue of alimony.

II. Property Determinations

¶47 Christopher challenges several of the trial court's summary judgment rulings establishing that certain property was Trishna's separate property. His arguments contain three main assertions: (1) that Trishna's failure to keep her separate funds in separate accounts as required by the Agreement should not be excused, (2) that the various documents Trishna signed in relation to property satisfied the transmutation requirement of the Agreement, and (3) that exhaustion tracing was not appropriately

applied to conclude that the property was obtained with Trishna's separate funds. We address each in turn.

## A.     Intermingling of Funds

¶48     Christopher focuses on the language of the Agreement that provided that, with some enumerated exceptions, "separate bank accounts [would] be maintained by each of the parties . . . with respect to the separate property cash of each." He asserts that this provision was not followed but, rather, "the parties had treated their wealth as the property of both," passing money "in and out of accounts in joint names." And Christopher suggests that the court erred in determining that Trishna's failure to follow this provision was, in his words, "inconsequential" and "should be excused."

¶49     The trial court "summarily rejected" Christopher's argument that Trishna was estopped from claiming that any of the funds in the joint account were her separate property. The court recognized that the Agreement directed the parties to keep separate funds in separate accounts, but it also determined that this provision of the Agreement did "not include any penalty or waiver provision which would direct the result [Christopher] seeks." The court therefore concluded, "[Trishna's] failure to keep her separate funds in a separate account necessitates the tracing of her funds, and it certainly has complicated these proceedings. But it does not support any waiver or estoppel argument."

¶50     Christopher advances no reasoned argument on appeal as to why this determination was in error and why Trishna's placement of her separate funds in their joint account was sufficient to override and prevent reliance on the transmutation requirement of the Agreement, which requirement Christopher concedes "was intended to prevent the accidental reclassification of property." That is, he faults the trial court's decision but provides no analysis as to why the trial court erred on this point.

¶51 "If an appellant does not meaningfully engage with the district court's reasoning, that appellant falls short of demonstrating any error on the part of the district court." *North Park Holdings LLC v. Duke Rental Co.*, 2025 UT App 42, ¶ 25, 567 P.3d 1085 (quotation simplified). "To demonstrate district court error, an appellant must support his [or her] argument with reasoned analysis based on relevant legal authority." *Yknot Global Ltd. v. Stellia Ltd.*, 2016 UT App 132, ¶ 23, 379 P.3d 36; *see also* Utah R. App. P. 24(a)(8) ("The [appellant's] argument must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal."); *Big Game Forever v. Peterson*, 2024 UT App 78, ¶ 19, 551 P.3d 411 ("Appellants carry the burden to persuade a reviewing court through reasoned, supported argument that the district court committed harmful, reversible error—a burden that necessarily requires the appellant to address the reasoning and basis of the district court's ruling and to explain why that court got it wrong." (quotation simplified)). "Where the contentions on appeal are asserted without the support of legal reasoning or authority, this court will not assume the appellant's burden of argument and research." *Yknot Global Ltd.*, 2016 UT App 132, ¶ 23 (quotation simplified). Because Christopher has neither engaged with the trial court's reasoning on this issue nor provided reasoned legal analysis on the issue, we do not consider this argument further.

B.    Transmutation

¶52 Christopher also argues that for several items of property, transmutation was achieved via Trishna "sign[ing] documents placing the property in question in joint names or in Christopher's sole name." That is, he asserts that such action was sufficient to satisfy the Agreement's transmutation provision, which declared that a party's separate property could "only become the separate property of the other or the parties' community property by a written instrument executed by the party whose separate property is thereby reclassified."

¶53 Trishna contends that, for most of the property at issue, Christopher waived or failed to preserve such arguments. Although Christopher made little effort to pinpoint the precise locations in the record where he raised this specific issue, we do at least see that the trial court addressed (in varying depths) and ruled on the issue in the multiple challenged summary judgment rulings, which is sufficient to preserve the issue for our review. *See Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 13, 379 P.3d 1218 ("[T]he district court's decision to take up the question conclusively overcame any objection that the issue was not preserved for appeal.").

¶54 However, on appeal, Christopher has not engaged with the reasoning underlying the trial court's transmutation conclusions and explained why the court erred in its consideration of the issue. And as we have explained above, an appellant must meaningfully engage with the trial court's decision—providing reasoned analysis and relevant legal authority—and an appellant who fails to satisfy this burden will fail to demonstrate trial court error. *See supra* ¶ 50.

¶55 Consistent with the Agreement's provision stating that the Agreement was "to be construed and enforced under the laws of the State of California," the trial court cited California law stating that "[a] transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." Cal. Fam. Code § 852(a). And the court further cited California case law clarifying that "to satisfy the requirement of an 'express declaration,' a writing signed by the adversely affected spouse must expressly state that the character or ownership of the property at issue is being changed." *In re Marriage of Bonvino*, 194 Cal. Rptr. 3d 754, 766–67 (Ct. App. 2015) (quotation simplified). The court then reasoned that the parties had produced only "the expected documentation incident to the purchase of [the properties]" and that "none of

these combine[d] an express declaration that [Trishna] intend[ed] to transmute her interest in the property with her signature executing the document." The court additionally reasoned that "[g]eneralized statements regarding the transfer of property that may be prepared incident to other transactions are insufficient" to transmute property, lest a party "'slip into a transmutation by accident.'" (Quoting *In re Marriage of Koester*, 87 Cal. Rptr. 2d 76, 80 n.5 (Ct. App. 1999).)

¶56 On appeal Christopher asserts that the trial court's conclusion was in error, but he fails to engage with the court's underlying reasoning and explain *why* it was in error.[7] The transmutation provision of the Agreement establishes that a reclassification of Trishna's property requires "a written instrument executed by" Trishna. But as to what qualifies as a written transmutation instrument or what such an instrument must contain, the Agreement is entirely silent. And Christopher does not carry his burden to persuade us that, in the face of this silence, the court erred in relying on California law to identify

---

7. In his reply brief, Christopher does briefly reference the California statute upon which the court relied and argue that this transmutation statute "is inapplicable to transactions in which property is acquired in joint names from third parties." But the authority on which Christopher relies for this proposition clarifies that this is so because such third-party transactions are not actually transmutations. *See Hanf v. Summers (In re Summers)*, 278 B.R. 808, 812 (B.A.P. 9th Cir. 2002) ("A transmutation is an *interspousal* transaction or agreement which works a change in the character of the property." (emphasis added) (quotation simplified)), *aff'd*, 332 F.3d 1240 (9th Cir. 2003). So even accepting this authority and reasoning, they would ultimately not support Christopher's assertion that the transmutation provision of the Agreement was satisfied here, because none of the documents on which he relies are interspousal agreements that would even qualify as transmutations.

what qualifies as a written transmutation instrument. Indeed, the law the court relied on was concerned with preventing accidental transmutation—a purpose that Christopher acknowledges was also the intent of the transmutation provision of the Agreement. And considering the purposes of the Agreement, we find unconvincing Christopher's bare assertion that the parties intended to "relax[] the statutory requirement" so that any writing was sufficient to transmute property. Thus, in failing to engage with the specific reasoning advanced by the trial court, Christopher has failed to persuade us that the court erred in its reasoning on this point, and we therefore affirm the court's transmutation rulings.

C.      Exhaustion Tracing

¶57    Christopher raises issues with the trial court's adoption of an "exhaustion tracing" methodology to classify and divide some of the property acquired during the marriage. He argues that when the court first conducted its tracing analysis and determined that the parties' living expenses always exceeded their salaries, the court was looking to the wrong years for its salary and expense amounts. But Christopher directs us to no location in the record where he raised such an argument before the trial court. Indeed, in the court's view, Christopher "acknowledged that the monthly cash salaries of the parties were exhausted in funding monthly household expenses."

¶58    Christopher also advances a related argument that exhaustion tracing requires "documentary proof that, on the date a disputed asset was acquired, all community income was exhausted by family expenses," and that it was error for the trial court to adopt the "cumulative approach" of tracing promoted by Trishna that more generally looked to income and expense amounts over broader periods of time. But again, Christopher points us to no location in the record below where this argument was brought to the attention of the trial court and no location in

the record where he suggested that the trial court's finding that monthly cash salaries were exhausted by monthly household expenses on a monthly basis would not satisfy the requirement of showing exhaustion of funds. Thus, Christopher has not preserved his claim of error on this front, and we affirm the trial court's various partial summary judgment rulings related to the distribution of Trishna's separate property. *See State v. Flora*, 2020 UT 2, ¶ 9, 459 P.3d 975 ("Under the doctrine of preservation, when a party fails to raise and argue an issue in the trial court, it has failed to preserve the issue, and an appellate court will not typically reach that issue absent a valid exception to preservation." (quotation simplified)).

### III. Attorney Fees

¶59　Christopher contests the trial court's denial of his request for attorney fees pursuant to Utah Code section 81-1-203(1). He argues that in a divorce case, an attorney fees award "must be 'based on evidence of the receiving spouse's financial need for attorney fees, the ability of the other spouse to pay, and the reasonableness of the requested award.'" (Quoting *Morgan v. Morgan*, 854 P.2d 559, 568 (Utah Ct. App. 1993).) And he challenges the trial court's underlying determination that he had no financial need for an award of attorney fees. We find merit in Christopher's argument.

¶60　As an initial matter, we agree with Christopher that section 81-1-203(1) is the statute applicable to this situation. The statute "authorizes courts to award attorney fees and costs in divorce cases if doing so would enable the other party to prosecute or defend the action." *Dahl v. Dahl*, 2015 UT 79, ¶ 168, 459 P.3d 276 (quotation simplified); *see also* Utah Code § 81-1-203(1)(a) (authorizing a court to award attorney fees to a spouse to "prosecute or defend the action" establishing initial divorce orders). And "such an award must be based on evidence of the receiving spouse's financial need, the payor spouse's ability to

pay, and the reasonableness of the requested fees." *Dahl*, 2015 UT 79, ¶ 168 (quotation simplified). "The award has nothing to do with whether the assets in dispute are marital [or separate property]." *Krajeski v. Krajeski*, 2025 UT App 19, ¶ 54, 565 P.3d 544, *cert. denied*, 574 P.3d 519 (Utah 2025).

¶61 We do not agree with the trial court that the Agreement, which was entered into in an attempt "to define the [parties'] respective rights . . . to the property of the other" and "to limit the application of the community property laws," can be read so broadly as to prevent an award of attorney fees to Christopher under the relevant attorney fees statute. Any award under this statute would not change the nature of any of Trishna's separate property. And such an award would also not be based on any application of community property law but, instead, on the court's equitable power to award fees in order to enable a party to "defend the action." Utah Code § 81-1-203(1)(a). Thus, an interpretation of the Agreement to disallow fees under the statute is an overly broad reading.

¶62 As to the specific issue of the trial court's assessment of Christopher's need for an award of attorney fees, Christopher argues that the court "engag[ed] in an artificial analysis that ignored the results of this case and Christopher's actual inability to pay his attorneys." He asserts that certain funds considered by the court "were not available to pay fees." We again agree.

¶63 Several amounts that the trial court considered when calculating the funds available to Christopher were incorrectly included in an assessment of Christopher's ability to pay. First, it was error for the trial court to both conclude that Christopher had essentially "no living expenses to speak of" due to Trishna's payments while also counting the same money that covered those expenses as funds that were available to Christopher to pay attorney fees. Those funds were paid to satisfy Christopher's actual expenses and, therefore, were not available to him to pay

his attorney fees. Likewise, the rental value of the marital home was not an amount available to Christopher to pay other expenses. Although the ability of Christopher to live in the home during the divorce proceedings had monetary value, that value was satisfying Christopher's housing expense and was not somehow available to Christopher to use as payment toward his attorney fees. Additionally, it was error for the trial court to consider the funds that Christopher had received that were also ordered to be paid back to Trishna. These funds were due to Trishna (with interest) and did not increase Christopher's ability to pay his own attorney fees.

¶64　Thus, the trial court exceeded the sound exercise of its discretion by considering these items as amounts available to Christopher for the payment of his attorney fees. We therefore reverse the denial of Christopher's request for attorney fees, and we remand to the trial court for it to reconsider Christopher's request without counting any of the foregoing amounts as available to Christopher when determining his financial need for an award of attorney fees.

## IV. Recusal

¶65　"A judge should be disqualified when circumstances arise in which the judge's impartiality might reasonably be questioned." *Dahl v. Dahl*, 2015 UT 79, ¶ 49, 459 P.3d 276 (quotation simplified). However, "[j]udges are presumed to be qualified and a party alleging bias on the part of the judge has the burden of demonstrating that the judge is not qualified." *Id.* "Moreover, parties claiming bias must demonstrate that the alleged bias stems from an extrajudicial source," *id.*; "adverse rulings alone are insufficient to establish the existence of judicial bias," *id.* ¶ 52.

¶66　But even an "appearance of bias may be grounds for reversal if actual prejudice is shown." *State v. Boyer*, 2020 UT App 23, ¶ 77, 460 P.3d 569 (quotation simplified). A judge should be

disqualified based on an appearance of bias whenever "the judge's impartiality might reasonably be questioned." *Id.* ¶ 78. "The question of a judge's impartiality is determined by viewing the question through the eyes of a reasonable person, knowing all the circumstances." *Id.* (quotation simplified).

¶67 Here, Christopher alleged that an appearance of bias existed with respect to the trial judge because the judge had an attorney-client relationship with a lawyer that belonged to the same law firm as did the attorney representing Trishna. The presiding judge who reviewed the motion to disqualify determined both that the motion was untimely and that Christopher had failed to show an appearance of bias. Christopher contests both determinations on appeal. But even assuming, without deciding, that the presiding judge was incorrect regarding the timeliness of Christopher's motion, we affirm the presiding judge's decision because we agree that there was no appearance of bias in this case. And because we determine that there was no appearance of bias, we need not examine whether Christopher was prejudiced.

¶68 The presiding judge largely based her decision to deny the motion to recuse on an informal opinion issued by the Utah Judicial Ethics Advisory Committee that addressed "cases in which the prosecuting attorney is in the same law firm as the judge's personal attorney." *See* Utah Jud. Ethics Advisory Comm., Informal Op. No. 99-9 (1999), https://www.utcourts.gov/en/court-records-publications/publications/judicial-ethics-opinions/ethics-opinions/1999/99-9.html [https://perma.cc/8978-EXZ4]. The opinion looked to the ethics opinions of several other states and agreed with "the majority of states" that a judge "presiding in a case involving a member of the law firm of the judge's attorney creates a situation in which the judge's impartiality might reasonably be questioned." *Id.* (quotation simplified). Nonetheless, the opinion concluded,

> The Committee thinks that, as a general rule, once the attorney-client relationship ceases the judge need not disclose the former relationship when a member of the former attorney's law firm appears. The Committee does not think that a reasonable person would find an appearance of bias. First, no on-going relationship with the law firm exists. Second, the relationship between the judge and the member of the former attorney's law firm is always more tenuous than between the judge and the judge's attorney.

*Id.* While this informal opinion is not binding on this court, we agree with the advisory committee's reasoning and conclusions on this point and choose to apply them to the facts here.

¶69   Although this case commenced before the issues related to the November 2018 retention election arose, Trishna was represented by different counsel during that time frame. The law firm in question did not become involved in this case until May 2019. And because Christopher has failed to show that the attorney-client relationship between the trial judge and a different attorney at the firm was still ongoing at that stage (and it seems it was not ongoing because it concerned a successful retention election held six months earlier), we agree with the presiding judge's conclusion that the trial judge need not have disclosed the former relationship at that point. Thus, Christopher has not established an appearance of bias in this case, and we affirm the denial of his motion to disqualify.

¶70   Christopher pushes back, arguing that the situation addressed by the informal opinion upon which the presiding judge relied contained "important factual distinctions" from the situation here. Specifically, he notes that the question posed in that case was in reference to a justice court judge and not a district court judge. But we see nothing in the reasoning of the informal

opinion that suggested that it was in any way limited to justice court judges. True, the opinion was based on a question presented in reference to a justice court judge, and the opinion also acknowledged that requiring disqualification "may be problematic in a justice court for which criminal cases are a significant portion of the caseload." *Id.* However, these are the only references to justice court in the opinion, and the opinion's reasoning regarding what does and does not result in an appearance of bias in no way suggested that it was specific to justice court judges. *See id.* Nor do we see any distinguishing features between justice court and district court that would suggest there should be a different recusal standard in the district court.

CONCLUSION

¶71   Christopher has not carried his burden to demonstrate error on the part of the trial court in its many summary judgment awards establishing that certain items of property were Trishna's separate property. We therefore affirm each of those determinations. Additionally, we see no error in the presiding judge's denial of Christopher's motion to disqualify the trial judge, and we therefore also affirm that decision.

¶72   We do, however, agree with Christopher that the trial court exceeded its discretion in determining that deficiencies in his expert disclosure were not harmless. We therefore reverse the exclusion of Expert and the resulting grant of summary judgment against Christopher as to his alimony request. Further, we determine that the trial court exceeded its discretion in its attorney fees determination, and we reverse that determination. We therefore remand this case for further proceedings and consideration of the alimony and attorney fees issues as may now be appropriate.

––––––––––